# BABBITT, SECRETARY OF INTERIOR, ET AL. *v.* SWEET HOME CHAPTER OF COMMUNITIES FOR A GREAT OREGON ET AL.

No. 94–859.   Argued April 17, 1995—Decided June 29, 1995

STEVENS, J., delivered the opinion of the Court, in which O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. O'CONNOR, J., filed a concurring opinion, *post*, p. 708. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and THOMAS, J., joined, *post*, p. 714.

*Deputy Solicitor General Kneedler* argued the cause for petitioners. With him on the briefs were *Solicitor General Days, Assistant Attorney General Schiffer, Beth S. Brinkmann, Martin W. Matzen, Ellen J. Durkee,* and *Jean E. Williams.*

*John A. Macleod* argued the cause for respondents. With him on the brief were *Steven P. Quarles, Clifton S. Elgarten, Thomas R. Lundquist,* and *William R. Murray.**

*Briefs of *amici curiae* urging reversal were filed for the Environmental Law Committee of the Association of the Bar of the City of New York by *Brent L. Brandenburg;* for Friends of Animals, Inc., by *Herman Kaufman;* for the National Wildlife Federation et al. by *Patti A. Goldman* and *Todd D. True;* and for Scientist John Cairns, Jr., et al. by *Wm. Robert Irvin, Timothy Eichenberg,* and *Patrick A. Parenteau.*

Briefs of *amici curiae* urging affirmance were filed for the State of Arizona ex rel. M. J. Hassel, Arizona State Land Commissioner, et al. by *Grant Woods,* Attorney General of Arizona, *Mary Mangotich Grier,* Assistant Attorney General, and *Gale A. Norton,* Attorney General of Colorado; for the State of California et al. by *Daniel Lungren,* Attorney General of California, *Roderick E. Walston,* Chief Assistant Attorney General, *Charles W. Getz IV,* Assistant Attorney General, and *Linus Masouredis,* Deputy Attorney General, and for the Attorneys General for their respective States as follows: *Carla J. Stovall* of Kansas, *Don Stenberg* of Nebraska, and *Jan Graham* of Utah; for the State of Texas by *Dan Morales,* Attorney General, *Jorge Vega,* First Assistant Attorney General, *Javier Aguilar* and *Sam Goodhope,* Special Assistant Attorneys General, and *Paul Terrill* and *Eugene Montes,* Assistant Attorneys General; for the American Farm Bureau Federation et al. by *Timothy S. Bishop, Michael F. Rosenblum, John J. Rademacher, Richard L. Krause, Nancy N. McDonough, Carolyn S. Richardson, Douglas G. Caroom,* and *Sydney W. Falk, Jr.;* for Anderson & Middleton Logging Co., Inc., by *Mark C. Rutzick* and *J. J. Leary, Jr.;* for Cargill, Inc., by *Louis F. Claiborne, Edgar B. Washburn,* and *David Ivester;* for the Chamber of Commerce of the United States of America et al. by *Virginia S. Albrecht, Robin S. Conrad, Ted R. Brown,* and *Ralph W. Holmen;* for the Competitive Enterprise Institute by *Sam Kazman;* for the Davis Mountains Trans-Pecos Heritage Association et al. by *Nancie G. Marzulla;* for the Florida Legal Foundation et al. by *Michael L. Rosen* and *G. Stephen Parker;* for the Institute for Justice by *Richard A. Epstein, William H. Mellor III,* and *Clint Bolick;* for the National Association of Home Builders et al. by *D. Barton Doyle;* for the National Cattlemen's Association et al. by *Roger J. Marzulla, Michael T. Lempres,* and *William G. Myers III;* for the Mountain States Legal Foundation et al. by *William Perry Pendley;* for the Pacific Legal Foundation et al. by *Robin L. Rivett;* for the State Water Contractors et al. by *Gregory K. Wilkinson, Eric L. Garner, Thomas*

JUSTICE STEVENS delivered the opinion of the Court.

The Endangered Species Act of 1973 (ESA or Act), 87 Stat. 884, 16 U. S. C. § 1531 (1988 ed. and Supp. V), contains a variety of protections designed to save from extinction species that the Secretary of the Interior designates as endangered or threatened. Section 9 of the Act makes it unlawful for any person to "take" any endangered or threatened species. The Secretary has promulgated a regulation that defines the statute's prohibition on takings to include "significant habitat modification or degradation where it actually kills or injures wildlife." This case presents the question whether the Secretary exceeded his authority under the Act by promulgating that regulation.

I

Section 9(a)(1) of the Act provides the following protection for endangered species:[1]

"Except as provided in sections 1535(g)(2) and 1539 of this title, with respect to any endangered species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to—

.          .          .          .          .

W. Birmingham, and Stuart L. Somach; for the Washington Legal Foundation et al. by Albert Gidari, Daniel J. Popeo, and Paul D. Kamenar; and for Congressman Bill Baker et al. by Virginia S. Albrecht.

Briefs of amici curiae were filed for the Nationwide Public Projects Coalition et al. by Lawrence R. Liebesman, Kenneth S. Kamlet, and Duane J. Desiderio; and for the Navajo Nation et al. by Scott B. McElroy, Lester K. Taylor, Daniel H. Israel, and Stanley Pollack.

[1] The Act defines the term "endangered species" to mean "any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man." 16 U. S. C. § 1532(6).

"(B) take any such species within the United States or the territorial sea of the United States." 16 U. S. C. § 1538(a)(1).

Section 3(19) of the Act defines the statutory term "take":

"The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U. S. C. § 1532(19).

The Act does not further define the terms it uses to define "take." The Interior Department regulations that implement the statute, however, define the statutory term "harm":

"*Harm* in the definition of 'take' in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 CFR § 17.3 (1994).

This regulation has been in place since 1975.[2]

A limitation on the § 9 "take" prohibition appears in § 10(a)(1)(B) of the Act, which Congress added by amendment in 1982. That section authorizes the Secretary to grant a permit for any taking otherwise prohibited by § 9(a)(1)(B) "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U. S. C. § 1539(a)(1)(B).

In addition to the prohibition on takings, the Act provides several other protections for endangered species. Section 4, 16 U. S. C. § 1533, commands the Secretary to identify species of fish or wildlife that are in danger of extinction and to publish from time to time lists of all species he determines to

---

[2] The Secretary, through the Director of the Fish and Wildlife Service, originally promulgated the regulation in 1975 and amended it in 1981 to emphasize that actual death or injury of a protected animal is necessary for a violation. See 40 Fed. Reg. 44412, 44416 (1975); 46 Fed. Reg. 54748, 54750 (1981).

be endangered or threatened. Section 5, 16 U. S. C. § 1534, authorizes the Secretary, in cooperation with the States, see § 1535, to acquire land to aid in preserving such species. Section 7 requires federal agencies to ensure that none of their activities, including the granting of licenses and permits, will jeopardize the continued existence of endangered species "or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical." 16 U. S. C. § 1536(a)(2).

Respondents in this action are small landowners, logging companies, and families dependent on the forest products industries in the Pacific Northwest and in the Southeast, and organizations that represent their interests. They brought this declaratory judgment action against petitioners, the Secretary of the Interior and the Director of the Fish and Wildlife Service, in the United States District Court for the District of Columbia to challenge the statutory validity of the Secretary's regulation defining "harm," particularly the inclusion of habitat modification and degradation in the definition.[3] Respondents challenged the regulation on its face. Their complaint alleged that application of the "harm" regulation to the red-cockaded woodpecker, an endangered species,[4] and the northern spotted owl, a threatened species,[5] had injured them economically. App. 17–23.

---

[3] Respondents also argued in the District Court that the Secretary's definition of "harm" is unconstitutionally void for vagueness, but they do not press that argument here.

[4] The woodpecker was listed as an endangered species in 1970 pursuant to the statutory predecessor of the ESA. See 50 CFR § 17.11(h) (1994), issued pursuant to the Endangered Species Conservation Act of 1969, 83 Stat. 275.

[5] See 55 Fed. Reg. 26114 (1990). Another regulation promulgated by the Secretary extends to threatened species, defined in the ESA as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," 16 U. S. C. § 1532(20), some but not all of the protections endangered species enjoy. See 50 CFR § 17.31(a) (1994). In the District Court respondents

Respondents advanced three arguments to support their submission that Congress did not intend the word "take" in § 9 to include habitat modification, as the Secretary's "harm" regulation provides. First, they correctly noted that language in the Senate's original version of the ESA would have defined "take" to include "destruction, modification, or curtailment of [the] habitat or range" of fish or wildlife,[6] but the Senate deleted that language from the bill before enacting it. Second, respondents argued that Congress intended the Act's express authorization for the Federal Government to buy private land in order to prevent habitat degradation in § 5 to be the exclusive check against habitat modification on private property. Third, because the Senate added the term "harm" to the definition of "take" in a floor amendment without debate, respondents argued that the court should not interpret the term so expansively as to include habitat modification.

The District Court considered and rejected each of respondents' arguments, finding "that Congress intended an expansive interpretation of the word 'take,' an interpretation that encompasses habitat modification." 806 F. Supp. 279, 285 (1992). The court noted that in 1982, when Congress was aware of a judicial decision that had applied the Secretary's regulation, see *Palila* v. *Hawaii Dept. of Land and Natural Resources*, 639 F. 2d 495 (CA9 1981) *(Palila I)*, it amended the Act without using the opportunity to change the definition of "take." 806 F. Supp., at 284. The court stated that, even had it found the ESA " 'silent or ambiguous' " as to the authority for the Secretary's definition of "harm," it would nevertheless have upheld the regulation as a reasonable interpretation of the statute. *Id.*, at 285 (quot-

---

unsuccessfully challenged that regulation's extension of § 9 to threatened species, but they do not press the challenge here.

[6] Senate 1983, reprinted in Hearings on S. 1592 and S. 1983 before the Subcommittee on Environment of the Senate Committee on Commerce, 93d Cong., 1st Sess., 27 (1973).

ing *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984)). The District Court therefore entered summary judgment for petitioners and dismissed respondents' complaint.

A divided panel of the Court of Appeals initially affirmed the judgment of the District Court. 1 F. 3d 1 (CADC 1993). After granting a petition for rehearing, however, the panel reversed. 17 F. 3d 1463 (CADC 1994). Although acknowledging that "[t]he potential breadth of the word 'harm' is indisputable," *id.*, at 1464, the majority concluded that the immediate statutory context in which "harm" appeared counseled against a broad reading; like the other words in the definition of "take," the word "harm" should be read as applying only to "the perpetrator's direct application of force against the animal taken . . . . The forbidden acts fit, in ordinary language, the basic model 'A hit B.'" *Id.*, at 1465. The majority based its reasoning on a canon of statutory construction called *noscitur a sociis*, which holds that a word is known by the company it keeps. See *Neal* v. *Clark*, 95 U. S. 704, 708–709 (1878).

The majority claimed support for its construction from a decision of the Ninth Circuit that narrowly construed the word "harass" in the Marine Mammal Protection Act of 1972, 16 U. S. C. § 1372(a)(2)(A), see *United States* v. *Hayashi*, 5 F. 3d 1278, 1282 (1993); from the legislative history of the ESA;[7] from its view that Congress must not have intended the purportedly broad curtailment of private property rights that the Secretary's interpretation permitted; and from the ESA's land acquisition provision in § 5 and restriction on federal agencies' activities regarding habitat in § 7, both of which the court saw as evidence that Congress had not intended the § 9 "take" prohibition to reach habitat modi-

---

[7] Judge Sentelle filed a partial concurrence in which he declined to join the portions of the court's opinion that relied on legislative history. See 17 F. 3d 1463, 1472 (CADC 1994).

fication. Most prominently, the court performed a lengthy analysis of the 1982 amendment to § 10 that provided for "incidental take permits" and concluded that the amendment did not change the meaning of the term "take" as defined in the 1973 statute.[8]

Chief Judge Mikva, who had announced the panel's original decision, dissented. See 17 F. 3d, at 1473. In his view, a proper application of *Chevron* indicated that the Secretary had reasonably defined "harm," because respondents had failed to show that Congress unambiguously manifested its intent to exclude habitat modification from the ambit of "take." Chief Judge Mikva found the majority's reliance on *noscitur a sociis* inappropriate in light of the statutory language and unnecessary in light of the strong support in the legislative history for the Secretary's interpretation. He did not find the 1982 "incidental take permit" amendment alone sufficient to vindicate the Secretary's definition of "harm," but he believed the amendment provided additional support for that definition because it reflected Congress' view in 1982 that the definition was reasonable.

The Court of Appeals' decision created a square conflict with a 1988 decision of the Ninth Circuit that had upheld the Secretary's definition of "harm." See *Palila* v. *Hawaii Dept. of Land and Natural Resources*, 852 F. 2d 1106 (1988) *(Palila II)*. The Court of Appeals neither cited nor distinguished *Palila II*, despite the stark contrast between the Ninth Circuit's holding and its own. We granted certiorari to resolve the conflict. 513 U. S. 1072 (1995). Our consideration of the text and structure of the Act, its legislative history, and the significance of the 1982 amendment persuades us that the Court of Appeals' judgment should be reversed.

---

[8] The 1982 amendment had formed the basis on which the author of the majority's opinion on rehearing originally voted to affirm the judgment of the District Court. Compare 1 F. 3d 1, 11 (CADC 1993) (Williams, J., concurring in part), with 17 F. 3d, at 1467–1472.

II

Because this case was decided on motions for summary judgment, we may appropriately make certain factual assumptions in order to frame the legal issue. First, we assume respondents have no desire to harm either the red-cockaded woodpecker or the spotted owl; they merely wish to continue logging activities that would be entirely proper if not prohibited by the ESA. On the other hand, we must assume, *arguendo*, that those activities will have the effect, even though unintended, of detrimentally changing the natural habitat of both listed species and that, as a consequence, members of those species will be killed or injured. Under respondents' view of the law, the Secretary's only means of forestalling that grave result—even when the actor knows it is certain to occur[9]—is to use his §5 authority to purchase

---

[9] As discussed above, the Secretary's definition of "harm" is limited to "act[s] which actually kil[l] or injur[e] wildlife." 50 CFR §17.3 (1994). In addition, in order to be subject to the Act's criminal penalties or the more severe of its civil penalties, one must "knowingly violat[e]" the Act or its implementing regulations. 16 U. S. C. §§1540(a)(1), (b)(1). Congress added "knowingly" in place of "willfully" in 1978 to make "criminal violations of the act a general rather than a specific intent crime." H. R. Conf. Rep. No. 95–1804, p. 26 (1978). The Act does authorize up to a $500 civil fine for "[a]ny person who otherwise violates" the Act or its implementing regulations. 16 U. S. C. §1540(a)(1). That provision is potentially sweeping, but it would be so with or without the Secretary's "harm" regulation, making it unhelpful in assessing the reasonableness of the regulation. We have imputed scienter requirements to criminal statutes that impose sanctions without expressly requiring scienter, see, *e. g.*, *Staples* v. *United States*, 511 U. S. 600 (1994), but the proper case in which we might consider whether to do so in the §9 provision for a $500 civil penalty would be a challenge to enforcement of that provision itself, not a challenge to a regulation that merely defines a statutory term. We do not agree with the dissent that the regulation covers results that are not "even foreseeable . . . no matter how long the chain of causality between modification and injury." *Post*, at 715. Respondents have suggested no reason why either the "knowingly violates" or the "otherwise violates" provision of the statute—or the "harm" regulation itself—should not be

the lands on which the survival of the species depends. The Secretary, on the other hand, submits that the § 9 prohibition on takings, which Congress defined to include "harm," places on respondents a duty to avoid harm that habitat alteration will cause the birds unless respondents first obtain a permit pursuant to § 10.

The text of the Act provides three reasons for concluding that the Secretary's interpretation is reasonable. First, an ordinary understanding of the word "harm" supports it. The dictionary definition of the verb form of "harm" is "to cause hurt or damage to: injure." Webster's Third New International Dictionary 1034 (1966). In the context of the ESA, that definition naturally encompasses habitat modification that results in actual injury or death to members of an endangered or threatened species.

Respondents argue that the Secretary should have limited the purview of "harm" to direct applications of force against protected species, but the dictionary definition does not include the word "directly" or suggest in any way that only direct or willful action that leads to injury constitutes "harm."[10] Moreover, unless the statutory term "harm" en-

read to incorporate ordinary requirements of proximate causation and foreseeability. In any event, neither respondents nor their *amici* have suggested that the Secretary employs the "otherwise violates" provision with any frequency.

[10] Respondents and the dissent emphasize what they portray as the "established meaning" of "take" in the sense of a "wildlife take," a meaning respondents argue extends only to "the effort to exercise dominion over some creature, and the concrete effect of [sic] that creature." Brief for Respondents 19; see *post*, at 717–718. This limitation ill serves the statutory text, which forbids not taking "some creature" but "tak[ing] any [endangered] *species*"—a formidable task for even the most rapacious feudal lord. More importantly, Congress explicitly defined the operative term "take" in the ESA, no matter how much the dissent wishes otherwise, see *post*, at 717–720, 722–723, thereby obviating the need for us to probe its meaning as we must probe the meaning of the undefined subsidiary term "harm." Finally, Congress' definition of "take" includes several words—

compasses indirect as well as direct injuries, the word has no meaning that does not duplicate the meaning of other words that § 3 uses to define "take." A reluctance to treat statutory terms as surplusage supports the reasonableness of the Secretary's interpretation. See, *e. g., Mackey* v. *Lanier Collection Agency & Service, Inc.,* 486 U. S. 825, 837, and n. 11 (1988).[11]

Second, the broad purpose of the ESA supports the Secretary's decision to extend protection against activities that cause the precise harms Congress enacted the statute to avoid. In *TVA* v. *Hill,* 437 U. S. 153 (1978), we described the Act as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.,* at 180. Whereas predecessor statutes enacted in 1966 and 1969 had not contained any sweeping prohibition against the taking of endangered species except on federal lands, see *id.,* at 175, the 1973 Act applied to all land in the United States and to the Nation's territorial seas. As stated in § 2 of the Act, among its central purposes is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . ." 16 U. S. C. § 1531(b).

---

most obviously "harass," "pursue," and "wound," in addition to "harm" itself—that fit respondents' and the dissent's definition of "take" no better than does "significant habitat modification or degradation."

[11] In contrast, if the statutory term "harm" encompasses such indirect means of killing and injuring wildlife as habitat modification, the other terms listed in § 3—"harass," "pursue," "hunt," "shoot," "wound," "kill," "trap," "capture," and "collect"—generally retain independent meanings. Most of those terms refer to deliberate actions more frequently than does "harm," and they therefore do not duplicate the sense of indirect causation that "harm" adds to the statute. In addition, most of the other words in the definition describe either actions from which habitat modification does not usually result (*e. g.,* "pursue," "harass") or effects to which activities that modify habitat do not usually lead (*e. g.,* "trap," "collect"). To the extent the Secretary's definition of "harm" may have applications that overlap with other words in the definition, that overlap reflects the broad purpose of the Act. See *infra* this page and 699–700.

In *Hill*, we construed § 7 as precluding the completion of the Tellico Dam because of its predicted impact on the survival of the snail darter. See 437 U. S., at 193. Both our holding and the language in our opinion stressed the importance of the statutory policy. "The plain intent of Congress in enacting this statute," we recognized, "was to halt and reverse the trend toward species extinction, whatever the cost. This is reflected not only in the stated policies of the Act, but in literally every section of the statute." *Id.*, at 184. Although the § 9 "take" prohibition was not at issue in *Hill*, we took note of that prohibition, placing particular emphasis on the Secretary's inclusion of habitat modification in his definition of "harm."[12] In light of that provision for habitat protection, we could "not understand how TVA intends to operate Tellico Dam without 'harming' the snail darter." *Id.*, at 184, n. 30. Congress' intent to provide comprehensive protection for endangered and threatened species supports the permissibility of the Secretary's "harm" regulation.

Respondents advance strong arguments that activities that cause minimal or unforeseeable harm will not violate the Act as construed in the "harm" regulation. Respondents, however, present a facial challenge to the regulation. Cf. *Anderson* v. *Edwards*, 514 U. S. 143, 155–156, n. 6 (1995); *INS* v. *National Center for Immigrants' Rights, Inc.*, 502 U. S. 183, 188 (1991). Thus, they ask us to invalidate the Secretary's understanding of "harm" in every circumstance, even when an actor knows that an activity, such as draining a

---

[12] We stated: "The Secretary of the Interior has defined the term 'harm' to mean 'an act or omission which actually injures or kills wildlife, including acts which annoy it to such an extent as to significantly disrupt essential behavioral patterns, which include, but are not limited to, breeding, feeding or sheltering; *significant environmental modification or degradation which has such effects is included within the meaning of "harm."*'" *TVA* v. *Hill*, 437 U. S., at 184–185, n. 30 (citations omitted; emphasis in original).

pond, would actually result in the extinction of a listed species by destroying its habitat. Given Congress' clear expression of the ESA's broad purpose to protect endangered and threatened wildlife, the Secretary's definition of "harm" is reasonable.[13]

Third, the fact that Congress in 1982 authorized the Secretary to issue permits for takings that § 9(a)(1)(B) would otherwise prohibit, "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity," 16 U. S. C. § 1539(a)(1)(B), strongly suggests that Congress understood § 9(a)(1)(B) to prohibit indirect as well as deliberate takings. Cf. *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 274–275 (1974). The permit process requires the applicant to prepare a "conservation plan" that specifies how he intends to "minimize and mitigate" the "impact" of his activity on endangered and threatened species, 16 U. S. C. § 1539(a)(2)(A), making clear that Congress had in mind foreseeable rather than merely accidental effects on listed species.[14] No one could seriously request an "incidental" take

---

[13] The dissent incorrectly asserts that the Secretary's regulation (1) "dispenses with the foreseeability of harm" and (2) "fail[s] to require injury to particular animals," *post*, at 731. As to the first assertion, the regulation merely implements the statute, and it is therefore subject to the statute's "knowingly violates" language, see 16 U. S. C. §§ 1540(a)(1), (b)(1), and ordinary requirements of proximate causation and foreseeability. See n. 9, *supra*. Nothing in the regulation purports to weaken those requirements. To the contrary, the word "actually" in the regulation should be construed to limit the liability about which the dissent appears most concerned, liability under the statute's "otherwise violates" provision. See n. 9, *supra; post*, at 721–722, 732–733. The Secretary did not need to include "actually" to connote "but for" causation, which the other words in the definition obviously require. As to the dissent's second assertion, every term in the regulation's definition of "harm" is subservient to the phrase "an act which actually kills or injures wildlife."

[14] The dissent acknowledges the legislative history's clear indication that the drafters of the 1982 amendment had habitat modification in mind, see *post;* at 730, but argues that the text of the amendment requires a contrary conclusion. This argument overlooks the statute's requirement of a "con-

permit to avert § 9 liability for direct, deliberate action against a member of an endangered or threatened species, but respondents would read "harm" so narrowly that the permit procedure would have little more than that absurd purpose. "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Stone* v. *INS*, 514 U. S. 386, 397 (1995). Congress' addition of the § 10 permit provision supports the Secretary's conclusion that activities not intended to harm an endangered species, such as habitat modification, may constitute unlawful takings under the ESA unless the Secretary permits them.

The Court of Appeals made three errors in asserting that "harm" must refer to a direct application of force because the words around it do.[15] First, the court's premise was flawed. Several of the words that accompany "harm" in the § 3 definition of "take," especially "harass," "pursue," "wound," and "kill," refer to actions or effects that do not require direct applications of force. Second, to the extent the court read a requirement of intent or purpose into the words used to define "take," it ignored § 11's express provision that a "know-

servation plan," which must describe an alternative to a known, but undesired, habitat modification.

[15] The dissent makes no effort to defend the Court of Appeals' reading of the statutory definition as requiring a direct application of force. Instead, it tries to impose on § 9 a limitation of liability to "affirmative conduct intentionally directed against a particular animal or animals." *Post*, at 720. Under the dissent's interpretation of the Act, a developer could drain a pond, knowing that the act would extinguish an endangered species of turtles, without even proposing a conservation plan or applying for a permit under § 10(a)(1)(B); unless the developer was motivated by a desire "to get at a turtle," *post*, at 721, no statutory taking could occur. Because such conduct would not constitute a taking at common law, the dissent would shield it from § 9 liability, even though the words "kill" and "harm" in the statutory definition could apply to such deliberate conduct. We cannot accept that limitation. In any event, our reasons for rejecting the Court of Appeals' interpretation apply as well to the dissent's novel construction.

in[g]" action is enough to violate the Act. Third, the court employed *noscitur a sociis* to give "harm" essentially the same function as other words in the definition, thereby denying it independent meaning. The canon, to the contrary, counsels that a word "gathers meaning from the words around it." *Jarecki* v. *G. D. Searle & Co.*, 367 U. S. 303, 307 (1961). The statutory context of "harm" suggests that Congress meant that term to serve a particular function in the ESA, consistent with, but distinct from, the functions of the other verbs used to define "take." The Secretary's interpretation of "harm" to include indirectly injuring endangered animals through habitat modification permissibly interprets "harm" to have "a character of its own not to be submerged by its association." *Russell Motor Car Co.* v. *United States*, 261 U. S. 514, 519 (1923).[16]

Nor does the Act's inclusion of the § 5 land acquisition authority and the § 7 directive to federal agencies to avoid destruction or adverse modification of critical habitat alter our conclusion. Respondents' argument that the Government lacks any incentive to purchase land under § 5 when it can simply prohibit takings under § 9 ignores the practical considerations that attend enforcement of the ESA. Purchasing habitat lands may well cost the Government less in many circumstances than pursuing civil or criminal penalties. In addition, the § 5 procedure allows for protection of habitat before the seller's activity has harmed any endangered ani-

---

[16] Respondents' reliance on *United States* v. *Hayashi*, 22 F. 3d 859 (CA9 1993), is also misplaced. *Hayashi* construed the term "harass," part of the definition of "take" in the Marine Mammal Protection Act of 1972, 16 U. S. C. § 1361 *et seq.*, as requiring a "direct intrusion" on wildlife to support a criminal prosecution. 22 F. 3d, at 864. *Hayashi* dealt with a challenge to a single application of a statute whose "take" definition includes neither "harm" nor several of the other words that appear in the ESA definition. Moreover, *Hayashi* was decided by a panel of the Ninth Circuit, the same court that had previously upheld the regulation at issue here in *Palila II*, 852 F. 2d 1106 (1988). Neither the *Hayashi* majority nor the dissent saw any need to distinguish or even to cite *Palila II*.

mal, whereas the Government cannot enforce the § 9 prohibition until an animal has actually been killed or injured. The Secretary may also find the § 5 authority useful for preventing modification of land that is not yet but may in the future become habitat for an endangered or threatened species. The § 7 directive applies only to the Federal Government, whereas the § 9 prohibition applies to "any person." Section 7 imposes a broad, affirmative duty to avoid adverse habitat modifications that § 9 does not replicate, and § 7 does not limit its admonition to habitat modification that "actually kills or injures wildlife." Conversely, § 7 contains limitations that § 9 does not, applying only to actions "likely to jeopardize the continued existence of any endangered species or threatened species," 16 U. S. C. § 1536(a)(2), and to modifications of habitat that has been designated "critical" pursuant to § 4, 16 U. S. C. § 1533(b)(2).[17] Any overlap that § 5 or § 7 may have with § 9 in particular cases is unexceptional, see, e. g., *Russello* v. *United States*, 464 U. S. 16, 24, and n. 2 (1983), and simply reflects the broad purpose of the Act set out in § 2 and acknowledged in *TVA* v. *Hill.*

We need not decide whether the statutory definition of "take" compels the Secretary's interpretation of "harm," because our conclusions that Congress did not unambiguously manifest its intent to adopt respondents' view and that the Secretary's interpretation is reasonable suffice to decide this case. See generally *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984). The latitude the ESA gives the Secretary in enforcing the statute, together with the degree of regulatory expertise necessary to its enforcement, establishes that we owe some degree of deference to the Secretary's reasonable interpretation. See

---

[17] Congress recognized that §§ 7 and 9 are not coextensive as to federal agencies when, in the wake of our decision in *Hill* in 1978, it added § 7*(o)*, 16 U. S. C. § 1536*(o)*, to the Act. That section provides that any federal project subject to exemption from § 7, 16 U. S. C. § 1536(h), will also be exempt from § 9.

Breyer, Judicial Review of Questions of Law and Policy, 38 Admin. L. Rev. 363, 373 (1986).[18]

## III

Our conclusion that the Secretary's definition of "harm" rests on a permissible construction of the ESA gains further support from the legislative history of the statute. The Committee Reports accompanying the bills that became the ESA do not specifically discuss the meaning of "harm," but they make clear that Congress intended "take" to apply broadly to cover indirect as well as purposeful actions. The Senate Report stressed that " '[t]ake' is defined . . . in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." S. Rep. No. 93–307, p. 7 (1973). The House Report stated that "the broadest possible terms" were used to define restrictions on takings. H. R. Rep. No. 93–412, p. 15 (1973). The House Report underscored the breadth of the

---

[18] Respondents also argue that the rule of lenity should foreclose any deference to the Secretary's interpretation of the ESA because the statute includes criminal penalties. The rule of lenity is premised on two ideas: First, " 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed' "; second, "legislatures and not courts should define criminal activity." *United States* v. *Bass*, 404 U. S. 336, 347–350 (1971) (quoting *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931)). We have applied the rule of lenity in a case raising a narrow question concerning the application of a statute that contains criminal sanctions to a specific factual dispute—whether pistols with short barrels and attachable shoulder stocks are short-barreled rifles—where no regulation was present. See *United States* v. *Thompson/Center Arms Co.*, 504 U. S. 505, 517–518, and n. 9 (1992). We have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement. Even if there exist regulations whose interpretations of statutory criminal penalties provide such inadequate notice of potential liability as to offend the rule of lenity, the "harm" regulation, which has existed for two decades and gives a fair warning of its consequences, cannot be one of them.

"take" definition by noting that it included "harassment, *whether intentional or not.*" *Id.*, at 11 (emphasis added). The Report explained that the definition "would allow, for example, the Secretary to regulate or prohibit the activities of birdwatchers where the effect of those activities might disturb the birds and make it difficult for them to hatch or raise their young." *Ibid.* These comments, ignored in the dissent's welcome but selective foray into legislative history, see *post*, at 726–729, support the Secretary's interpretation that the term "take" in § 9 reached far more than the deliberate actions of hunters and trappers.

Two endangered species bills, S. 1592 and S. 1983, were introduced in the Senate and referred to the Commerce Committee. Neither bill included the word "harm" in its definition of "take," although the definitions otherwise closely resembled the one that appeared in the bill as ultimately enacted. See Hearings on S. 1592 and S. 1983 before the Subcommittee on Environment of the Senate Committee on Commerce, 93d Cong., 1st Sess., pp. 7, 27 (1973) (hereinafter Hearings). Senator Tunney, the floor manager of the bill in the Senate, subsequently introduced a floor amendment that added "harm" to the definition, noting that this and accompanying amendments would "help to achieve the purposes of the bill." 119 Cong. Rec. 25683 (1973). Respondents argue that the lack of debate about the amendment that added "harm" counsels in favor of a narrow interpretation. We disagree. An obviously broad word that the Senate went out of its way to add to an important statutory definition is precisely the sort of provision that deserves a respectful reading.

The definition of "take" that originally appeared in S. 1983 differed from the definition as ultimately enacted in one other significant respect: It included "the destruction, modification, or curtailment of [the] habitat or range" of fish and wildlife. Hearings, at 27. Respondents make much of the fact that the Commerce Committee removed this phrase

from the "take" definition before S. 1983 went to the floor. See 119 Cong. Rec. 25663 (1973). We do not find that fact especially significant. The legislative materials contain no indication why the habitat protection provision was deleted. That provision differed greatly from the regulation at issue today. Most notably, the habitat protection provision in S. 1983 would have applied far more broadly than the regulation does because it made adverse habitat modification a categorical violation of the "take" prohibition, unbounded by the regulation's limitation to habitat modifications that actually kill or injure wildlife. The S. 1983 language also failed to qualify "modification" with the regulation's limiting adjective "significant." We do not believe the Senate's unelaborated disavowal of the provision in S. 1983 undermines the reasonableness of the more moderate habitat protection in the Secretary's "harm" regulation.[19]

---

[19] Respondents place heavy reliance for their argument that Congress intended the §5 land acquisition provision and not §9 to be the ESA's remedy for habitat modification on a floor statement by Senator Tunney:

"Many species have been inadvertently exterminated by a negligent destruction of their habitat. Their habitats have been cut in size, polluted, or otherwise altered so that they are unsuitable environments for natural populations of fish and wildlife. Under this bill, we can take steps to make amends for our negligent encroachment. The Secretary would be empowered to use the land acquisition authority granted to him in certain existing legislation to acquire land for the use of the endangered species programs. . . . Through these land acquisition provisions, we will be able to conserve habitats necessary to protect fish and wildlife from further destruction.

"Although most endangered species are threatened primarily by the destruction of their natural habitats, a significant portion of these animals are subject to predation by man for commercial, sport, consumption, or other purposes. The provisions in S. 1983 would prohibit the commerce in or the importation, exportation, or taking of endangered species . . . ." 119 Cong. Rec. 25669 (1973).

Similarly, respondents emphasize a floor statement by Representative Sullivan, the House floor manager for the ESA:

"For the most part, the principal threat to animals stems from destruction of their habitat. . . . H. R. 37 will meet this problem by providing

The history of the 1982 amendment that gave the Secretary authority to grant permits for "incidental" takings provides further support for his reading of the Act. The House Report expressly states that "[b]y use of the word 'incidental' the Committee intends to cover situations in which it is known that a taking will occur if the other activity is engaged in but such taking is incidental to, and not the purpose of, the activity." H. R. Rep. No. 97–567, p. 31 (1982). This reference to the foreseeability of incidental takings undermines respondents' argument that the 1982 amendment covered only accidental killings of endangered and threatened animals that might occur in the course of hunting or trapping other animals. Indeed, Congress had habitat modification directly in mind: Both the Senate Report and the House Conference Report identified as the model for the permit process a cooperative state-federal response to a case in California where a development project threatened incidental harm to a species of endangered butterfly by modification of its habitat. See S. Rep. No. 97–418, p. 10 (1982); H. R. Conf. Rep. No. 97–835, pp. 30–32 (1982). Thus, Congress in 1982 focused squarely on the aspect of the "harm" regulation at issue in this litigation. Congress' implementation of a permit pro-

---

funds for acquisition of critical habitat.... It will also enable the Department of Agriculture to cooperate with willing landowners who desire to assist in the protection of endangered species, but who are understandably unwilling to do so at excessive cost to themselves.

"Another hazard to endangered species arises from those who would capture or kill them for pleasure or profit. There is no way that Congress can make it less pleasurable for a person to take an animal, but we can certainly make it less profitable for them to do so." *Id.*, at 30162.

Each of these statements merely explained features of the bills that Congress eventually enacted in § 5 of the ESA and went on to discuss elements enacted in § 9. Neither statement even suggested that § 5 would be the Act's exclusive remedy for habitat modification by private landowners or that habitat modification by private landowners stood outside the ambit of § 9. Respondents' suggestion that these statements identified § 5 as the ESA's only response to habitat modification contradicts their emphasis elsewhere on the habitat protections in § 7. See *supra*, at 702–703.

gram is consistent with the Secretary's interpretation of the term "harm."

## IV

When it enacted the ESA, Congress delegated broad administrative and interpretive power to the Secretary. See 16 U. S. C. §§ 1533, 1540(f). The task of defining and listing endangered and threatened species requires an expertise and attention to detail that exceeds the normal province of Congress. Fashioning appropriate standards for issuing permits under § 10 for takings that would otherwise violate § 9 necessarily requires the exercise of broad discretion. The proper interpretation of a term such as "harm" involves a complex policy choice. When Congress has entrusted the Secretary with broad discretion, we are especially reluctant to substitute our views of wise policy for his. See *Chevron*, 467 U. S., at 865–866. In this case, that reluctance accords with our conclusion, based on the text, structure, and legislative history of the ESA, that the Secretary reasonably construed the intent of Congress when he defined "harm" to include "significant habitat modification or degradation that actually kills or injures wildlife."

In the elaboration and enforcement of the ESA, the Secretary and all persons who must comply with the law will confront difficult questions of proximity and degree; for, as all recognize, the Act encompasses a vast range of economic and social enterprises and endeavors. These questions must be addressed in the usual course of the law, through case-by-case resolution and adjudication.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

My agreement with the Court is founded on two understandings. First, the challenged regulation is limited to significant habitat modification that causes actual, as opposed

to hypothetical or speculative, death or injury to identifiable protected animals. Second, even setting aside difficult questions of scienter, the regulation's application is limited by ordinary principles of proximate causation, which introduce notions of foreseeability. These limitations, in my view, call into question *Palila* v. *Hawaii Dept. of Land and Natural Resources*, 852 F. 2d 1106 (CA9 1988) *(Palila II)*, and with it, many of the applications derided by the dissent. Because there is no need to strike a regulation on a facial challenge out of concern that it is susceptible of erroneous application, however, and because there are many habitat-related circumstances in which the regulation might validly apply, I join the opinion of the Court.

In my view, the regulation is limited by its terms to actions that actually kill or injure individual animals. JUSTICE SCALIA disagrees, arguing that the harm regulation "encompasses injury inflicted, not only upon individual animals, but upon populations of the protected species." *Post*, at 716. At one level, I could not reasonably quarrel with this observation; death to an individual animal always reduces the size of the population in which it lives, and in that sense, "injures" that population. But by its insight, the dissent means something else. Building upon the regulation's use of the word "breeding," JUSTICE SCALIA suggests that the regulation facially bars significant habitat modification that actually kills or injures *hypothetical* animals (or, perhaps more aptly, causes potential additions to the population not to come into being). Because "[i]mpairment of breeding does not 'injure' living creatures," JUSTICE SCALIA reasons, the regulation *must* contemplate application to "*a population* of animals which would otherwise have maintained or increased its numbers." *Post*, at 716, 734.

I disagree. As an initial matter, I do not find it as easy as JUSTICE SCALIA does to dismiss the notion that significant impairment of breeding injures living creatures. To raze the last remaining ground on which the piping plover cur-

rently breeds, thereby making it impossible for any piping plovers to reproduce, would obviously injure the population (causing the species' extinction in a generation). But by completely preventing breeding, it would also injure the individual living bird, in the same way that sterilizing the creature injures the individual living bird. To "injure" is, among other things, "to impair." Webster's Ninth New Collegiate Dictionary 623 (1983). One need not subscribe to theories of "psychic harm," cf. *post,* at 734–735, n. 5, to recognize that to make it impossible for an animal to reproduce is to impair its most essential physical functions and to render that animal, and its genetic material, biologically obsolete. This, in my view, is actual injury.

In any event, even if impairing an animal's ability to breed were not, *in and of itself,* an injury to that animal, interference with breeding can cause an animal to suffer other, perhaps more obvious, kinds of injury. The regulation has clear application, for example, to significant habitat modification that kills or physically injures animals which, because they are in a vulnerable breeding state, do not or cannot flee or defend themselves, or to environmental pollutants that cause an animal to suffer physical complications during gestation. Breeding, feeding, and sheltering are what animals do. If significant habitat modification, by interfering with these essential behaviors, actually kills or injures an animal protected by the Act, it causes "harm" within the meaning of the regulation. In contrast to JUSTICE SCALIA, I do not read the regulation's "breeding" reference to vitiate or somehow to qualify the clear actual death or injury requirement, or to suggest that the regulation contemplates extension to nonexistent animals.

There is no inconsistency, I should add, between this interpretation and the commentary that accompanied the amendment of the regulation to include the actual death or injury requirement. See 46 Fed. Reg. 54748 (1981). Quite the contrary. It is true, as JUSTICE SCALIA observes, *post,* at 716,

that the Fish and Wildlife Service states at one point that "harm" is not limited to "direct physical injury to an individual member of the wildlife species," see 46 Fed. Reg. 54748 (1981). But one could just as easily emphasize the word "direct" in this sentence as the word "individual."* Elsewhere in the commentary, the Service makes clear that "section 9's threshold does focus on individual members of a protected species." *Id.*, at 54749. Moreover, the Service says that the regulation has no application to speculative harm, explaining that its insertion of the word "actually" was intended "to bulwark the need for proven injury to a species due to a party's actions." *Ibid.;* see also *ibid.* (approving language that "[h]arm covers actions . . . which actually (as opposed to potentially), cause injury"). That a protected animal could have eaten the leaves of a fallen tree or could, perhaps, have fruitfully multiplied in its branches is not sufficient under the regulation. Instead, as the commentary reflects, the regulation requires demonstrable effect (*i. e.*, actual injury or death) on actual, individual members of the protected species.

By the dissent's reckoning, the regulation at issue here, in conjunction with 16 U. S. C. § 1540(a)(1), imposes liability for any habitat-modifying conduct that ultimately results in the death of a protected animal, "regardless of whether that result is intended or even foreseeable, and no matter how long

---

*JUSTICE SCALIA suggests that, if the word "direct" merits emphasis in this sentence, then the sentence should be read as an effort to negate principles of proximate causation. See *post,* at 734–735, n. 5. As this case itself demonstrates, however, the word "direct" is susceptible of many meanings. The Court of Appeals, for example, used "direct" to suggest an element of purposefulness. See 17 F. 3d 1463, 1465 (CADC 1994). So, occasionally, does the dissent. See *post,* at 720 (describing "affirmative acts . . . which are *directed* immediately and intentionally against a particular animal") (emphasis added). It is not hard to imagine conduct that, while "indirect" (*i. e.*, nonpurposeful), proximately causes actual death or injury to individual protected animals, cf. *post,* at 732; indeed, principles of proximate cause routinely apply in the negligence and strict liability contexts.

the chain of causality between modification and injury." *Post*, at 715; see also *post*, at 719. Even if § 1540(a)(1) does create a strict liability regime (a question we need not decide at this juncture), I see no indication that Congress, in enacting that section, intended to dispense with ordinary principles of proximate causation. Strict liability means liability without regard to fault; it does not normally mean liability for every consequence, however remote, of one's conduct. See generally W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 559–560 (5th ed. 1984) (describing "practical necessity for the restriction of liability within some reasonable bounds" in the strict liability context). I would not lightly assume that Congress, in enacting a strict liability statute that is silent on the causation question, has dispensed with this well-entrenched principle. In the absence of congressional abrogation of traditional principles of causation, then, private parties should be held liable under § 1540(a)(1) only if their habitat-modifying actions proximately cause death or injury to protected animals. Cf. *Benefiel* v. *Exxon Corp.*, 959 F. 2d 805, 807–808 (CA9 1992) (in enacting the Trans-Alaska Pipeline Authorization Act, which provides for strict liability for damages that are the result of discharges, Congress did not intend to abrogate common-law principles of proximate cause to reach "remote and derivative" consequences); *New York* v. *Shore Realty Corp.*, 759 F. 2d 1032, 1044, and n. 17 (CA2 1985) (noting that "[t]raditional tort law has often imposed strict liability while recognizing a causation defense," but that, in enacting the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Congress "specifically rejected including a causation requirement"). The regulation, of course, does not contradict the presumption or notion that ordinary principles of causation apply here. Indeed, by use of the word "actually," the regulation clearly rejects speculative or conjectural effects, and thus itself *invokes* principles of proximate causation.

Proximate causation is not a concept susceptible of precise definition. See Keeton, *supra,* at 280–281. It is easy enough, of course, to identify the extremes. The farmer whose fertilizer is lifted by a tornado from tilled fields and deposited miles away in a wildlife refuge cannot, by any stretch of the term, be considered the proximate cause of death or injury to protected species occasioned thereby. At the same time, the landowner who drains a pond on his property, killing endangered fish in the process, would likely satisfy any formulation of the principle. We have recently said that proximate causation "normally eliminates the bizarre," *Jerome B. Grubart, Inc.* v. *Great Lakes Dredge & Dock Co.,* 513 U. S. 527, 536 (1995), and have noted its "functionally equivalent" alternative characterizations in terms of foreseeability, see *Milwaukee & St. Paul R. Co.* v. *Kellogg,* 94 U. S. 469, 475 (1877) ("natural and probable consequence"), and duty, see *Palsgraf* v. *Long Island R. Co.,* 248 N. Y. 339, 162 N. E. 99 (1928). *Consolidated Rail Corporation* v. *Gottshall,* 512 U. S. 532, 546 (1994). Proximate causation depends to a great extent on considerations of the fairness of imposing liability for remote consequences. The task of determining whether proximate causation exists in the limitless fact patterns sure to arise is best left to lower courts. But I note, at the least, that proximate cause principles inject a foreseeability element into the statute, and hence, the regulation, that would appear to alleviate some of the problems noted by the dissent. See, *e. g., post,* at 719 (describing "a farmer who tills his field and causes erosion that makes silt run into a nearby river which depletes oxygen and thereby [injures] protected fish").

In my view, then, the "harm" regulation applies where significant habitat modification, by impairing essential behaviors, proximately (foreseeably) causes actual death or injury to identifiable animals that are protected under the Endangered Species Act. Pursuant to my interpretation, *Palila II*—under which the Court of Appeals held that a state

agency committed a "taking" by permitting mouflon sheep to eat mamane-naio seedlings that, when full grown, might have fed and sheltered endangered palila—was wrongly decided according to the regulation's own terms. Destruction of the seedlings did not proximately cause actual death or injury to identifiable birds; it merely prevented the regeneration of forest land not currently sustaining actual birds.

This case, of course, comes to us as a facial challenge. We are charged with deciding whether the regulation on its face exceeds the agency's statutory mandate. I have identified at least one application of the regulation *(Palila II)* that is, in my view, inconsistent with the regulation's *own* limitations. That misapplication does not, however, call into question the validity of the regulation itself. One can doubtless imagine questionable applications of the regulation that test the limits of the agency's authority. However, it seems to me clear that the regulation does not on its terms exceed the agency's mandate, and that the regulation has innumerable valid habitat-related applications. Congress may, of course, see fit to revisit this issue. And nothing the Court says today prevents the agency itself from narrowing the scope of its regulation at a later date.

With this understanding, I join the Court's opinion.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

I think it unmistakably clear that the legislation at issue here (1) forbade the hunting and killing of endangered animals, and (2) provided federal lands and federal funds *for the acquisition of private lands,* to preserve the habitat of endangered animals. The Court's holding that the hunting and killing prohibition incidentally preserves habitat on private lands imposes unfairness to the point of financial ruin—not just upon the rich, but upon the simplest farmer who finds his land conscripted to national zoological use. I respectfully dissent.

I

The Endangered Species Act of 1973 (Act), 16 U.S.C. § 1531 *et seq.* (1988 ed. and Supp. V), provides that "it is unlawful for any person subject to the jurisdiction of the United States to—. . . take any [protected] species within the United States." § 1538(a)(1)(B). The term "take" is defined as "to harass, *harm*, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." § 1532(19) (emphasis added). The challenged regulation defines "harm" thus:

> "*Harm* in the definition of 'take' in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 CFR § 17.3 (1994).

In my view petitioners must lose—the regulation must fall—even under the test of *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984), so I shall assume that the Court is correct to apply *Chevron.* See *ante,* at 703–704, and n. 18.

The regulation has three features which, for reasons I shall discuss at length below, do not comport with the statute. First, it interprets the statute to prohibit habitat modification that is no more than the cause-in-fact of death or injury to wildlife. *Any* "significant habitat modification" that in fact produces that result by "impairing essential behavioral patterns" is made unlawful, regardless of whether that result is intended or even foreseeable, and no matter how long the chain of causality between modification and injury. See, *e. g., Palila* v. *Hawaii Dept. of Land and Natural Resources,* 852 F. 2d 1106, 1108–1109 (CA9 1988) *(Palila II)* (sheep grazing constituted "taking" of palila birds, since although sheep do not destroy full-grown mamane trees, they do destroy mamane seedlings, which will not grow to

full-grown trees, on which the palila feeds and nests). See also Davison, Alteration of Wildlife Habitat as a Prohibited Taking under the Endangered Species Act, 10 J. Land Use & Envtl. L. 155, 190 (1995) (regulation requires only causation-in-fact).

Second, the regulation does not require an "act": The Secretary's officially stated position is that an *omission* will do. The previous version of the regulation made this explicit. See 40 Fed. Reg. 44412, 44416 (1975) ("'Harm' in the definition of 'take' in the Act means an act or omission which actually kills or injures wildlife . . ."). When the regulation was modified in 1981 the phrase "or omission" was taken out, but only because (as the final publication of the rule advised) "the [Fish and Wildlife] Service feels that 'act' is inclusive of either commissions or omissions which would be prohibited by section [1538(a)(1)(B)]." 46 Fed. Reg. 54748, 54750 (1981). In their brief here petitioners agree that the regulation covers omissions, see Brief for Petitioners 47 (although they argue that "[a]n 'omission' constitutes an 'act' . . . only if there is a legal duty to act"), *ibid.*

The third and most important unlawful feature of the regulation is that it encompasses injury inflicted, not only upon individual animals, but upon populations of the protected species. "Injury" in the regulation includes "significantly impairing essential behavioral patterns, including *breeding*," 50 CFR § 17.3 (1994) (emphasis added). Impairment of breeding does not "injure" living creatures; it prevents them from propagating, thus "injuring" *a population* of animals which would otherwise have maintained or increased its numbers. What the face of the regulation shows, the Secretary's official pronouncements confirm. The Final Redefinition of "Harm" accompanying publication of the regulation said that "harm" is not limited to "direct physical injury to an individual member of the wildlife species," 46 Fed. Reg. 54748 (1981), and refers to "injury *to a population*," *id.*, at 54749 (emphasis added). See also *Palila II, supra*, at 1108;

Davison, *supra*, at 190, and n. 177, 195; M. Bean, The Evolution of National Wildlife Law 344 (1983).[1]

*None* of these three features of the regulation can be found in the statutory provisions supposed to authorize it. The term "harm" in § 1532(19) has no legal force of its own. An indictment or civil complaint that charged the defendant with "harming" an animal protected under the Act would be dismissed as defective, for the only *operative* term in the statute is to "take." If "take" were not elsewhere defined in the Act, none could dispute what it means, for the term is as old as the law itself. To "take," when applied to wild animals, means to reduce those animals, by killing or capturing, to human control. See, *e. g.*, 11 Oxford English Dictionary (1933) ("Take . . . To catch, capture (a wild beast, bird, fish, etc.)"); Webster's New International Dictionary of the English Language (2d ed. 1949) (take defined as "to catch or capture by trapping, snaring, etc., or as prey"); *Geer* v. *Connecticut*, 161 U. S. 519, 523 (1896) ("'[A]ll the animals which can be taken upon the earth, in the sea, or in the air, that is to say, wild animals, belong to those who take them'") (quoting the Digest of Justinian); 2 W. Blackstone, Commentaries 411 (1766) ("Every man . . . has an equal right of pursuing and taking to his own use all such creatures as are *ferae naturae*"). This is just the sense in which "take" is used elsewhere in federal legislation and treaty. See, *e. g.*, Migratory Bird Treaty Act, 16 U. S. C. § 703 (1988 ed., Supp. V) (no person may "pursue, hunt, take, capture, kill, [or] attempt to take, capture, or kill" any migratory bird); Agreement on the Conservation of Polar Bears, Nov. 15, 1973, Art. I, 27 U. S. T. 3918, 3921, T. I. A. S. No. 8409 (defining "taking" as "hunting, killing and capturing"). And that meaning fits neatly with the rest of § 1538(a)(1), which makes it unlawful not only to take protected species, but also to import or export them,

---

[1] The Court and JUSTICE O'CONNOR deny that the regulation has the first or the third of these features. I respond to their arguments in Part III, *infra*.

§ 1538(a)(1)(A); to possess, sell, deliver, carry, transport, or ship any taken species, § 1538(a)(1)(D); and to transport, sell, or offer to sell them in interstate or foreign commerce, §§ 1538(a)(1)(E), (F). The taking prohibition, in other words, is only part of the regulatory plan of § 1538(a)(1), which covers all the stages of the process by which protected wildlife is reduced to man's dominion and made the object of profit. It is obvious that "take" in this sense—a term of art deeply embedded in the statutory and common law concerning wildlife—describes a class of acts (not omissions) done directly and intentionally (not indirectly and by accident) to particular animals (not populations of animals).

The Act's definition of "take" does expand the word slightly (and not unusually), so as to make clear that it includes not just a completed taking, but the process of taking, and all of the acts that are customarily identified with or accompany that process ("to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect"); and so as to include attempts. § 1532(19). The tempting fallacy—which the Court commits with abandon, see *ante*, at 697–698, n. 10—is to assume that *once defined*, "take" loses any significance, and it is only the definition that matters. The Court treats the statute as though Congress had directly enacted the § 1532(19) definition as a self-executing prohibition, and had not enacted § 1538(a)(1)(B) at all. But § 1538(a)(1)(B) *is* there, and if the terms contained in the definitional section are susceptible of two readings, one of which comports with the standard meaning of "take" as used in application to wildlife, and one of which does not, an agency regulation that adopts the latter reading is necessarily unreasonable, for it reads the defined term "take"—the only operative term—out of the statute altogether.[2]

---

[2] The Court suggests halfheartedly that "take" cannot refer to the taking of particular animals, because § 1538(a)(1)(B) prohibits "tak[ing] any [endangered] *species.*" *Ante*, at 697, n. 10. The suggestion is halfhearted because that reading obviously contradicts the statutory intent. It would

That is what has occurred here. The verb "harm" has a *range* of meaning: "to cause injury" at its broadest, "to do hurt or damage" in a narrower and more direct sense. See, *e. g.,* 1 N. Webster, An American Dictionary of the English Language (1828) ("Harm, *v.t.* To hurt; to injure; to damage; *to impair soundness of body, either animal* or vegetable") (emphasis added); American College Dictionary 551 (1970) ("harm . . . *n.* injury; damage; hurt: *to do him bodily harm*"). In fact the more directed sense of "harm" is a somewhat more common and preferred usage; "*harm* has in it a little of the idea of specially focused hurt or injury, as if a personal injury has been anticipated and intended." J. Opdycke, Mark My Words: A Guide to Modern Usage and Expression 330 (1949). See also American Heritage Dictionary 662 (1985) ("*Injure* has the widest range. . . . *Harm* and *hurt* refer principally to what causes physical or mental distress to living things"). To define "harm" as an act or omission that, however remotely, "actually kills or injures" a population of wildlife through habitat modification is to choose a meaning that makes nonsense of the word that "harm" defines—requiring us to accept that a farmer who tills his field and causes erosion that makes silt run into a nearby river which depletes oxygen and thereby "impairs [the] breeding" of protected fish has "taken" or "attempted to take" the fish. It should take the strongest evidence to make us believe that Congress has defined a term in a manner repugnant to its ordinary and traditional sense.

Here the evidence shows the opposite. "Harm" is merely one of 10 prohibitory words in § 1532(19), and the other 9 fit the ordinary meaning of "take" perfectly. To "harass, pursue, hunt, shoot, wound, kill, trap, capture, or collect" are

mean no violation in the intentional shooting of a single bald eagle—or, for that matter, the intentional shooting of 1,000 bald eagles out of the extant 1,001. The phrasing of § 1538(a)(1)(B), as the Court recognizes elsewhere, see, *e. g., ante,* at 696, is shorthand for "take any [*member of an endangered*] species."

all affirmative acts (the provision itself describes them as "conduct," see § 1532(19)) which are directed immediately and intentionally against a particular animal—not acts or omissions that indirectly and accidentally cause injury to a population of animals. The Court points out that several of the words ("harass," "pursue," "wound," and "kill") "refer to actions or effects that do not require direct *applications of force.*" *Ante,* at 701 (emphasis added). That is true enough, but force is not the point. Even "taking" activities in the narrowest sense, activities traditionally engaged in by hunters and trappers, do not all consist of direct applications of force; pursuit and harassment are part of the business of "taking" the prey even before it has been touched. What the nine other words in § 1532(19) have in common—and share with the narrower meaning of "harm" described above, but not with the Secretary's ruthless dilation of the word— is the sense of affirmative conduct intentionally directed against a particular animal or animals.

I am not the first to notice this fact, or to draw the conclusion that it compels. In 1981 the Solicitor of the Fish and Wildlife Service delivered a legal opinion on § 1532(19) that is in complete agreement with my reading:

> "The Act's definition of 'take' contains a list of actions that illustrate the intended scope of the term . . . . With the possible exception of 'harm,' these terms all represent forms of conduct that are directed against and likely to injure or kill *individual* wildlife. Under the principle of statutory construction, *ejusdem generis,* . . . the term 'harm' should be interpreted to include only those actions that are directed against, and likely to injure or kill, individual wildlife." Memorandum of Apr. 17, reprinted in 46 Fed. Reg. 29490, 29491 (1981) (emphasis in original).

I would call it *noscitur a sociis,* but the principle is much the same: The fact that "several items in a list share an attribute

counsels in favor of interpreting the other items as possessing that attribute as well," *Beecham* v. *United States*, 511 U. S. 368, 371 (1994). The Court contends that the canon cannot be applied to deprive a word of all its "independent meaning," *ante*, at 702. That proposition is questionable to begin with, especially as applied to long lawyers' listings such as this. If it were true, we ought to give the word "trap" in the definition its rare meaning of "to clothe" (whence "trappings")—since otherwise it adds nothing to the word "capture." See *Moskal* v. *United States*, 498 U. S. 103, 120 (1990) (SCALIA, J., dissenting). In any event, the Court's contention that "harm" in the narrow sense adds nothing to the other words underestimates the ingenuity of our own species in a way that Congress did not. To feed an animal poison, to spray it with mace, to chop down the very tree in which it is nesting, or even to destroy its entire habitat in order to take it (as by draining a pond to get at a turtle), might neither wound nor kill, but would directly and intentionally harm.

The penalty provisions of the Act counsel this interpretation as well. Any person who "knowingly" violates § 1538(a)(1)(B) is subject to criminal penalties under § 1540(b)(1) and civil penalties under § 1540(a)(1); moreover, under the latter section, any person "who otherwise violates" the taking prohibition (*i. e.*, violates it *un*knowingly) may be assessed a civil penalty of $500 for each violation, with the stricture that "[e]ach such violation shall be a separate offense." This last provision should be clear warning that the regulation is in error, for when combined with the regulation it produces a result that no legislature could reasonably be thought to have intended: A large number of routine private activities—for example, farming, ranching, roadbuilding, construction and logging—are subjected to strict-liability penalties when they fortuitously injure protected wildlife, no matter how remote the chain of causation and no matter how difficult to foresee (or to disprove) the "injury" may be (*e. g.*,

an "impairment" of breeding). The Court says that "[the strict-liability provision] is potentially sweeping, but it would be so with or without the Secretary's 'harm' regulation." *Ante*, at 696, n. 9. That is not correct. Without the regulation, the routine "habitat modifying" activities that people conduct to make a daily living would not carry exposure to strict penalties; only acts directed at animals, like those described by the other words in § 1532(19), would risk liability.

The Court says that "[to] read a requirement of intent or purpose into the words used to define 'take' . . . ignore[s] [§ 1540's] express provision that a 'knowin[g]' action is enough to violate the Act." *Ante*, at 701–702. This presumably means that because the reading of § 1532(19) advanced here ascribes an element of purposeful injury to the prohibited acts, it makes superfluous (or inexplicable) the more severe penalties provided for a "knowing" violation. That conclusion does not follow, for it is quite possible to take protected wildlife purposefully without doing so knowingly. A requirement that a violation be "knowing" means that the defendant must "know the facts that make his conduct illegal," *Staples* v. *United States*, 511 U. S. 600, 606 (1994). The hunter who shoots an elk in the mistaken belief that it is a mule deer has not knowingly violated § 1538(a)(1)(B)—not because he does not know that elk are legally protected (that would be knowledge of the law, which is not a requirement, see *ante*, at 696–697, n. 9), but because he does not know what sort of animal he is shooting. The hunter has nonetheless committed a purposeful taking of protected wildlife, and would therefore be subject to the (lower) strict-liability penalties for the violation.

So far I have discussed only the immediate statutory text bearing on the regulation. But the definition of "take" in § 1532(19) applies "[f]or the purposes of this chapter," that is, it governs the meaning of the word *as used everywhere in the Act*. Thus, the Secretary's interpretation of "harm" is wrong if it does not fit with the use of "take" throughout

the Act. And it does not. In § 1540(e)(4)(B), for example, Congress provided for the forfeiture of "[a]ll guns, traps. nets, and other equipment . . . used to aid the taking, possessing, selling, [etc.]" of protected animals. This listing plainly relates to "taking" in the ordinary sense. If environmental modification were part (and necessarily a major part) of taking, as the Secretary maintains, one would have expected the list to include "plows, bulldozers, and backhoes." As another example, § 1539(e)(1) exempts "the taking of any endangered species" by Alaskan Indians and Eskimos "if such taking is primarily for subsistence purposes"; and provides that "[n]on-edible byproducts of species taken pursuant to this section may be sold . . . when made into authentic native articles of handicrafts and clothing." Surely these provisions apply to taking only in the ordinary sense, and are meaningless as applied to species injured by environmental modification. The Act is full of like examples. See, *e. g.,* § 1538(a)(1)(D) (prohibiting possession, sale, and transport of "species taken in violation" of the Act). "[I]f the Act is to be interpreted as a symmetrical and coherent regulatory scheme, one in which the operative words have a consistent meaning throughout," *Gustafson* v. *Alloyd Co.,* 513 U. S. 561, 569 (1995), the regulation must fall.

The broader structure of the Act confirms the unreasonableness of the regulation. Section 1536 provides:

> "Each Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or *result in the destruction or adverse modification of habitat* of such species which is determined by the Secretary . . . to be critical." 16 U. S. C. § 1536(a)(2) (emphasis added).

The Act defines "critical habitat" as habitat that is "essential to the conservation of the species," §§ 1532(5)(A)(i), (A)(ii), with "conservation" in turn defined as the use of methods

necessary to bring listed species "to the point at which the measures provided pursuant to this chapter are no longer necessary," § 1532(3).

These provisions have a double significance. Even if §§ 1536(a)(2) and 1538(a)(1)(B) were totally independent prohibitions—the former applying only to federal agencies and their licensees, the latter only to private parties—Congress's explicit prohibition of habitat modification in the one section would bar the inference of an implicit prohibition of habitat modification in the other section. "[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp.* v. *United States*, 508 U. S. 200, 208 (1993) (internal quotation marks omitted). And that presumption against implicit prohibition would be even stronger where the one section which uses the language carefully defines and limits its application. That is to say, it would be passing strange for Congress carefully to define "critical habitat" as used in § 1536(a)(2), but leave it to the Secretary to evaluate, willy-nilly, impermissible "habitat modification" (under the guise of "harm") in § 1538(a)(1)(B).

In fact, however, §§ 1536(a)(2) and 1538(a)(1)(B) do *not* operate in separate realms; federal agencies are subject to *both*, because the "person[s]" forbidden to take protected species under § 1538 include agencies and departments of the Federal Government. See § 1532(13). This means that the "harm" regulation also contradicts another principle of interpretation: that statutes should be read so far as possible to give independent effect to all their provisions. See *Ratzlaf* v. *United States*, 510 U. S. 135, 140–141 (1994). By defining "harm" in the definition of "take" in § 1538(a)(1)(B) to include significant habitat modification that injures populations of wildlife, the regulation makes the habitat-modification restriction in § 1536(a)(2) almost wholly superfluous. As "critical habitat" is habitat "essential to the conservation of the

species," adverse modification of "critical" habitat by a federal agency would also constitute habitat modification that injures a population of wildlife.

Petitioners try to salvage some independent scope for § 1536(a)(2) by the following contortion: Because the definition of critical habitat includes not only "the specific areas within the geographical area occupied by the species [that are] essential to the conservation of the species," § 1532(5)(A)(i), but also "specific areas outside the geographical area occupied by the species at the time it is listed [as a protected species] . . . [that are] essential to the conservation of the species," § 1532A(5)(ii), there may be some agency modifications of critical habitat which do *not* injure a population of wildlife. See Brief for Petitioners 41, and n. 27. This is dubious to begin with. A principal way to injure wildlife under the Secretary's own regulation is to "significantly impai[r] . . . breeding," 50 CFR § 17.3 (1994). To prevent the natural increase of a species by adverse modification of habitat suitable for expansion assuredly impairs breeding. But even if true, the argument only narrows the scope of the superfluity, leaving as so many wasted words the § 1532(a)(5)(i) definition of critical habitat to include currently *occupied* habitat essential to the species' conservation. If the Secretary's definition of "harm" under § 1538(a)(1)(B) is to be upheld, we must believe that Congress enacted § 1536(a)(2) solely because in its absence federal agencies would be able to modify habitat in currently *unoccupied* areas. It is more rational to believe that the Secretary's expansion of § 1538(a)(1)(B) carves out the heart of one of the central provisions of the Act.

## II

The Court makes four other arguments. First, "the broad purpose of the [Act] supports the Secretary's decision to extend protection against activities that cause the precise harms Congress enacted the statute to avoid." *Ante,* at 698.

I thought we had renounced the vice of "simplistically . . . assum[ing] that *whatever* furthers the statute's primary objective must be the law." *Rodriguez* v. *United States*, 480 U. S. 522, 526 (1987) *(per curiam)* (emphasis in original). Deduction from the "broad purpose" of a statute begs the question if it is used to decide by what *means* (and hence to what *length*) Congress pursued that purpose; to get the right answer to that question there is no substitute for the hard job (or, in this case, the quite simple one) of reading the whole text. "The Act must do everything necessary to achieve its broad purpose" is the slogan of the enthusiast, not the analytical tool of the arbiter.[3]

Second, the Court maintains that the legislative history of the 1973 Act supports the Secretary's definition. See *ante*, at 704–706. Even if legislative history were a legitimate and reliable tool of interpretation (which I shall assume in order to rebut the Court's claim); and even if it could appropriately be resorted to when the enacted text is as clear as this, but see *Chicago* v. *Environmental Defense Fund*, 511 U. S. 328, 337 (1994); here it shows quite the opposite of what the Court says. I shall not pause to discuss the Court's reliance on such statements in the Committee Reports as " '[t]ake' is defined . . . in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife.' " S. Rep. No. 93–307, p. 7 (1973) (quoted *ante*, at 704). This sort of empty flourish—to the effect that "this statute means what it means all the way"—

---

[3] This portion of the Court's opinion, see *ante*, at 699, n. 12, discusses and quotes a footnote in *TVA* v. *Hill*, 437 U. S. 153, 184–185, n. 30 (1978), in which we described the then-current version of the Secretary's regulation, and said that the habitat modification undertaken by the federal agency in the case would have violated the regulation. Even if we had said that the Secretary's regulation was *authorized* by § 1538, that would have been utter dictum, for the only provision at issue was § 1536. See *id.*, at 193. But in fact we simply opined on the effect of the regulation while assuming its validity, just as courts always do with provisions of law whose validity is not at issue.

counts for little even when enacted into the law itself. See *Reves* v. *Ernst & Young*, 507 U. S. 170, 183–184 (1993).

Much of the Court's discussion of legislative history is devoted to two items: first, the Senate floor manager's introduction of an amendment that added the word "harm" to the definition of "take," with the observation that (along with other amendments) it would "'help to achieve the purposes of the bill'"; second, the relevant Committee's removal from the definition of a provision stating that "take" includes "'the destruction, modification or curtailment of [the] habitat or range'" of fish and wildlife. See *ante*, at 705. The Court inflates the first and belittles the second, even though the second is on its face far more pertinent. But this elaborate inference from various pre-enactment actions and inactions is quite unnecessary, since we have *direct* evidence of what those who brought the legislation to the floor thought it meant—evidence as solid as any ever to be found in legislative history, but which the Court banishes to a footnote. See *ante*, at 706–707, n. 19.

Both the Senate and House floor managers of the bill explained it in terms which leave no doubt that the problem of habitat destruction on private lands was to be solved principally by the land acquisition program of § 1534, while § 1538 solved a different problem altogether—the problem of takings. Senator Tunney stated:

> "*Through [the] land acquisition provisions, we will be able to conserve habitats necessary to protect fish and wildlife from further destruction.*
>
> "Although most endangered species are threatened primarily by the destruction of their natural habitats, a significant portion of these animals are subject to *predation by man for commercial, sport, consumption, or other purposes.* The provisions of [the bill] would prohibit the commerce in or the importation, exportation, or taking of endangered species . . . ." 119 Cong. Rec. 25669 (1973) (emphasis added).

The House floor manager, Representative Sullivan, put the same thought in this way:

> "[T]he principal threat to animals stems from destruction of their habitat. . . . *[The bill] will meet this problem by providing funds for acquisition of critical habitat.* . . . It will also enable the Department of Agriculture to cooperate with willing landowners who desire to assist in the protection of endangered species, *but who are understandably unwilling to do so at excessive cost to themselves.*
>
> "Another hazard to endangered species arises from those who would *capture or kill them for pleasure or profit.* There is no way that the Congress can make it less pleasurable for a person to take an animal, but we can certainly make it less profitable for them to do so." *Id.*, at 30162 (emphasis added).

Habitat modification and takings, in other words, were viewed as different problems, addressed by different provisions of the Act. The Court really has no explanation for these statements. All it can say is that "[n]either statement even suggested that [the habitat acquisition funding provision in § 1534] would be the Act's exclusive remedy for habitat modification by private landowners or that habitat modification by private landowners stood outside the ambit of [§ 1538]." *Ante,* at 707, n. 19. That is to say, the statements are not as bad as they might have been. Little in life is. They are, however, quite bad enough to destroy the Court's legislative-history case, since they display the clear understanding (1) that habitat modification is separate from "taking," and (2) that habitat destruction on private lands is to be remedied by public acquisition, and *not* by making particular unlucky landowners incur "excessive cost to themselves." The Court points out triumphantly that they do not display the understanding (3) that the land acquisition program is "the [Act's] only response to habitat modifica-

tion." *Ibid.* Of course not, since that is not so (all *public* lands are subject to habitat-modification restrictions); but (1) and (2) are quite enough to exclude the Court's interpretation. They identify the land acquisition program as the Act's only response to habitat modification *by private landowners*, and thus do not in the least "contradic[t]," *ibid.*, the fact that § 1536 prohibits habitat modification *by federal agencies.*

Third, the Court seeks support from a provision that was added to the Act in 1982, the year after the Secretary promulgated the current regulation. The provision states:

> "[T]he Secretary may permit, under such terms and conditions as he shall prescribe—
>
> .      .      .      .      .
>
> "any taking otherwise prohibited by section 1538 (a)(1)(B) . . . if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U. S. C. § 1539(a)(1)(B).

This provision does not, of course, implicate our doctrine that reenactment of a statutory provision ratifies an extant judicial or administrative interpretation, for neither the taking prohibition in § 1538(a)(1)(B) nor the definition in § 1532(19) was reenacted. See *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.,* 511 U. S. 164, 185 (1994). The Court claims, however, that the provision "strongly suggests that Congress understood [§ 1538(a)(1)(B)] to prohibit indirect as well as deliberate takings." *Ante,* at 700. That would be a valid inference if habitat modification were the only substantial "otherwise lawful activity" that might incidentally and nonpurposefully cause a prohibited "taking." Of course it is not. This provision applies to the many otherwise lawful takings that incidentally take a protected species—as when fishing for unprotected salmon also takes an endangered species of salmon, see *Pacific Northwest Generating Cooperative* v. *Brown,* 38 F. 3d 1058, 1067 (CA9 1994).

Congress has referred to such "incidental takings" in other statutes as well—for example, a statute referring to "the incidental taking of . . . sea turtles in the course of . . . harvesting [shrimp]" and to the "rate of incidental taking of sea turtles by United States vessels in the course of such harvesting," 103 Stat. 1038, § 609(b)(2), note following 16 U. S. C. § 1537 (1988 ed., Supp. V); and a statute referring to "the incidental taking of marine mammals in the course of commercial fishing operations," 108 Stat. 546, § 118(a). The Court shows that it misunderstands the question when it says that "[n]o one could seriously request an 'incidental' take permit to avert . . . liability for direct, deliberate action *against a member of an endangered or threatened species." Ante*, at 700–701 (emphasis added). That is not an *incidental* take at all.[4]

This is enough to show, in my view, that the 1982 permit provision does not support the regulation. I must acknowledge that the Senate Committee Report on this provision, and the House Conference Committee Report, clearly contemplate that it will enable the Secretary to permit environmental modification. See S. Rep. No. 97–418, p. 10 (1982); H. R. Conf. Rep. No. 97–835, pp. 30–32 (1982). But the *text* of the amendment cannot possibly bear that asserted meaning, when placed within the context of an Act that must be interpreted (as we have seen) not to prohibit private environmental modification. The neutral language of the amendment cannot possibly alter that interpretation, nor can its legislative history be summoned forth to contradict, rather than clarify, what is in its totality an unambiguous statutory text. See *Chicago* v. *Environmental Defense Fund,* 511 U. S. 328 (1994). There is little fear, of course,

---

[4] The statutory requirement of a "conservation plan" is as consistent with this construction as with the Court's. See *ante,* at 700, and n. 14. The commercial fisherman who is in danger of incidentally sweeping up protected fish in his nets can quite reasonably be required to "minimize and mitigate" the "impact" of his activity. 16 U. S. C. § 1539(a)(2)(A).

that giving no effect to the relevant portions of the Committee Reports will frustrate the real-life expectations of a majority of the Members of Congress. If they read and relied on such tedious detail on such an obscure point (it was not, after all, presented as a revision of the statute's prohibitory scope, but as a discretionary-waiver provision) the Republic would be in grave peril.

Fourth and lastly, the Court seeks to avoid the evident shortcomings of the regulation on the ground that the respondents are challenging it on its face rather than as applied. See *ante*, at 699; see also *ante*, at 709 (O'CONNOR, J., concurring). The Court seems to say that *even if* the regulation dispenses with the foreseeability of harm that it acknowledges the statute to require, that does not matter because this is a facial challenge: So long as habitat modification that *would* foreseeably cause harm is prohibited by the statute, the regulation must be sustained. Presumably it would apply the same reasoning to all the other defects of the regulation: The regulation's failure to require injury to particular animals survives the present challenge, because at least *some* environmental modifications kill particular animals. This evisceration of the facial challenge is unprecedented. It is one thing to say that a facial challenge to a regulation that omits statutory element *x* must be rejected if there is any set of facts on which the statute *does not require x*. It is something quite different—and unlike any doctrine of "facial challenge" I have ever encountered—to say that the challenge must be rejected if the regulation could be applied to a state of facts in which element *x happens to be present*. On this analysis, the only regulation susceptible to facial attack is one that *not only* is invalid in all its applications, but also does not sweep up *any* person who *could have been* held liable under a proper application of the statute. That is not the law. Suppose a statute that prohibits "premeditated killing of a human being," and an implementing regulation that prohibits "killing a human

being." A facial challenge to the regulation would not be rejected on the ground that, after all, it *could* be applied to a killing that happened to be premeditated. It *could not* be applied to such a killing, because it does not require the factfinder to find premeditation, as the statute requires. In other words, to simplify its task the Court today confuses lawful application of the challenged regulation with lawful application of a *different* regulation, *i. e.*, one requiring the various elements of liability that this regulation omits.

## III

In response to the points made in this dissent, the Court's opinion stresses two points, neither of which is supported by the regulation, and so cannot validly be used to uphold it. First, the Court and the concurrence suggest that the regulation should be read to contain a requirement of proximate causation or foreseeability, principally *because the statute does*—and "[n]othing in the regulation purports to weaken those requirements [of the statute]." See *ante*, at 696–697, n. 9; 700, n. 13; see also *ante*, at 711–713 (O'CONNOR, J., concurring). I quite agree that the statute contains such a limitation, because the verbs of purpose in § 1538(a)(1)(B) denote action directed at animals. *But the Court has rejected that reading.* The critical premise on which it has upheld the regulation is that, despite the weight of the other words in § 1538(a)(1)(B), "the statutory term 'harm' encompasses indirect as well as direct injuries," *ante*, at 697–698. See also *ante*, at 698, n. 11 (describing "the sense of indirect causation that 'harm' adds to the statute"); *ante*, at 702 (stating that the Secretary permissibly interprets " 'harm' " to include "indirectly injuring endangered animals"). Consequently, unless there is some strange category of causation that is indirect and yet also proximate, the Court has already rejected its own basis for finding a proximate-cause limitation in the regulation. In fact "proximate" causation simply *means* "direct" causation. See, *e. g.*, Black's Law Dictionary 1103

(5th ed. 1979) (defining "[p]roximate" as "Immediate; nearest; *direct*") (emphasis added); Webster's New International Dictionary 1995 (2d ed. 1949) ("[P]roximate cause. A cause which *directly*, or with no mediate agency, produces an effect") (emphasis added).

The only other reason given for finding a proximate-cause limitation in the regulation is that "by use of the word 'actually,' the regulation clearly rejects speculative or conjectural effects, and thus itself *invokes* principles of proximate causation." *Ante*, at 712 (O'CONNOR, J., concurring); see also *ante*, at 700, n. 13 (majority opinion). *Non sequitur*, of course. That the injury must be "actual" as opposed to "potential" simply says nothing at all about the length or foreseeability of the causal chain between the habitat modification and the "actual" injury. It is thus true and irrelevant that "[t]he Secretary did not need to include 'actually' to connote 'but for' causation," *ibid.;* "actually" defines the requisite *injury*, not the requisite *causality*.

The regulation says (it is worth repeating) that "harm" means (1) an act that (2) actually kills or injures wildlife. If that does not dispense with a proximate-cause requirement, I do not know what language would. And changing the regulation by judicial invention, even to achieve compliance with the statute, is not permissible. Perhaps the agency itself would prefer to achieve compliance in some other fashion. We defer to reasonable agency interpretations of ambiguous statutes precisely in order that agencies, rather than courts, may exercise policymaking discretion in the interstices of statutes. See *Chevron*, 467 U. S., at 843–845. Just as courts may not exercise an agency's power to adjudicate, and so may not affirm an agency order on discretionary grounds the agency has not advanced, see *SEC* v. *Chenery Corp.*, 318 U. S. 80 (1943), so also this Court may not exercise the Secretary's power to regulate, and so may not uphold a regulation by adding to it even the most reasonable of elements it does not contain.

The second point the Court stresses in its response seems to me a belated mending of its holding. It apparently *concedes* that the statute requires injury *to particular animals* rather than merely to populations of animals. See *ante*, at 700, n. 13; *ante*, at 696 (referring to killing or injuring *"members* of [listed] species" (emphasis added)). The Court then rejects my contention that the regulation ignores this requirement, since, it says, "every term in the regulation's definition of 'harm' is subservient to the phrase 'an act which actually kills or injures wildlife.'" *Ante*, at 700, n. 13. As I have pointed out, see *supra*, at 716–717, this reading is incompatible with the regulation's specification of impairment of "breeding" as one of the *modes* of "kill[ing] or injur-[ing] wildlife."[5]

---

[5] JUSTICE O'CONNOR supposes that an "impairment of breeding" intrinsically injures an animal because "to make it impossible for an animal to reproduce is to impair its most essential physical functions and to render that animal, and its genetic material, biologically obsolete." *Ante*, at 710 (concurring opinion). This imaginative construction does achieve the result of extending "impairment of breeding" to individual animals; but only at the expense of also expanding "injury" to include elements beyond *physical harm* to individual animals. For surely the only harm to the individual animal from impairment of that "essential function" is not the failure of issue (which harms only the issue), but the *psychic harm* of perceiving that it will leave this world with no issue (assuming, of course, that the animal in question, perhaps an endangered species of slug, is capable of such painful sentiments). If it includes *that* psychic harm, then why not the psychic harm of not being able to frolic about—so that the draining of a pond used for an endangered animal's recreation, but in no way essential to its survival, would be prohibited by the Act? That the concurrence is driven to such a dubious redoubt is an argument for, not against, the proposition that "injury" in the regulation includes injury to populations of animals. Even more so with the concurrence's alternative explanation: that "impairment of breeding" refers to nothing more than concrete injuries inflicted by the habitat modification on the animal who does the breeding, such as "physical complications [suffered] during gestation," *ibid.* Quite obviously, if "impairment of breeding" meant

But since the Court is reading the regulation and the statute incorrectly in other respects, it may as well introduce this novelty as well—law à la carte. As I understand the regulation that the Court has created and held consistent with the statute that it has also created, habitat modification can constitute a "taking," but only if it results in the killing or harming of *individual animals*, and only if that consequence is the direct result of the modification. This means that the destruction of privately owned habitat that is essential, not for the feeding or nesting, but for the *breeding*, of butterflies, would not violate the Act, since it would not harm or kill any living butterfly. I, too, think it would not violate the Act—not for the utterly unsupported reason that habitat modifications fall outside the regulation if they happen not to kill or injure a living animal, but for the textual reason that only action directed at living animals constitutes a "take."

\*　　\*　　\*

The Endangered Species Act is a carefully considered piece of legislation that forbids all persons to hunt or harm endangered animals, but places upon the public at large,

---

such physical harm to an individual animal, it would not have had to be mentioned.

The concurrence entangles itself in a dilemma while attempting to explain the Secretary's commentary to the harm regulation, which stated that "harm" is not limited to "direct physical injury to an individual member of the wildlife species," 46 Fed. Reg. 54748 (1981). The concurrence denies that this means that the regulation does not require injury to particular animals, because "one could just as easily emphasize the word 'direct' in this sentence as the word 'individual.'" *Ante*, at 711. One could; but if the concurrence does, it thereby refutes its separate attempt to exclude indirect causation from the regulation's coverage, see *ante*, at 711–713. The regulation, after emerging from the concurrence's analysis, has acquired *both* a proximate-cause limitation *and* a particular-animals limitation—precisely the one meaning that the Secretary's quoted declaration will not allow, whichever part of it is emphasized.

rather than upon fortuitously accountable individual landowners, the cost of preserving the habitat of endangered species. There is neither textual support for, nor even evidence of congressional consideration of, the radically different disposition contained in the regulation that the Court sustains. For these reasons, I respectfully dissent.