## NATURAL RESOURCES

### STATE ENDANGERED SPECIES ACT – RESPONSIBILITIES OF THE DEPARTMENT OF NATURAL RESOURCES, THE PUBLIC SERVICE COMMISSION, AND OTHER AGENCIES UNDER THE ENDANGERED SPECIES ACT

March 23, 2010

**R E V I S E D**

*The Honorable George C. Edwards*
*The Honorable Wendell R. Beitzel*
*The Honorable Kevin Kelly*
*The Honorable LeRoy E. Myers*
*Allegany County Delegation*

You have asked about the responsibilities of the Department of Natural Resources ("DNR"), the Public Service Commission ("PSC"), and other agencies with respect to the protection of endangered species. Citing *Animal Welfare Institute v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540 (D. Md. 2009), a case involving the federal Endangered Species Act, you also ask whether "State law similarly prohibits a corporation from setting up wind turbines that may lead to the taking of endangered species."

In comparison to the federal statute, the State endangered species law provides similar, although not identical, protections for State-listed threatened and endangered species. Given that the State law was patterned after the federal statute, Maryland courts construing the State statute are likely to apply the standards developed under the federal statute. In *Beech Ridge,* the federal district court granted an injunction against a wind energy project in West Virginia after it was demonstrated that the project was "reasonably certain" imminently to harm, kill, or wound a listed endangered species and the developer of the project had not obtained a permit allowing the incidental taking of an endangered species. This opinion describes generally the roles of DNR, the PSC, and certain other State agencies under the State endangered species laws. In addition, it discusses possible consideration by DNR and the PSC of impacts on endangered species when those agencies implement statutes governing new power generating facilities.

# I

## Endangered Species Acts

### *A.     The Federal ESA*

The federal Endangered Species Act ("federal ESA") makes it unlawful for any person to "take any [endangered] species within the United States." 16 U.S.C. §1538(a)(1)(B). The federal ESA defines the term "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. §1532(19).

*Regulations defining "harm" and "harass"*

The regulations implementing the federal ESA define the activities that constitute an impermissible "take."  For example, "harass" means "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 CFR §17.3.  "Harm" is an act that "actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id.*

*Civil and criminal penalties*

A person who knowingly takes an endangered species in violation of the federal ESA is subject to significant civil and criminal penalties.  16 U.S.C. §1540(a) (authorizing civil fines of up to $25,000 per violation); §1540(b) (authorizing criminal fines of up to $50,000 and imprisonment for one year).  The federal ESA authorizes citizens to bring suit to enforce its provisions.  16 U.S.C. §1540(g).

*Incidental take permits*

Congress amended the federal ESA in 1982 to provide a "safe harbor" from these penalties.  In particular, that amendment established an "incidental take permit" ("ITP") process that allows an entity or other person to lawfully take an endangered species "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  16 U.S.C. §1539(a)(1)(B).  The *Beech Ridge* court explained:

> Congress established this process to reduce conflicts between species threatened with extinction and economic development activities, and to encourage "creative partnerships" between public and private sectors.

*Beech Ridge Energy*, 675 F.Supp. 2d  at 544 (citations omitted).

### *Standard for showing that a project would "harm"*

The *Beech Ridge* decision illustrates the application of the "harm" prong of the ESA.  In *Beech Ridge*, the plaintiffs filed an action seeking declaratory and injunctive relief against Beech Ridge Energy LLC, alleging that the construction and future operation of its wind energy project in West Virginia would take endangered Indiana bats, in violation of  the federal ESA, 16 U.S.C. §1538(a)(1)(B).  Beech Ridge Energy had not obtained an ITP.

The question before the court was whether Beech Ridge Energy should have obtained an ITP because the wind turbines potentially would take the Indiana bats present at the project site.  In assessing this claim, the court observed that the federal ESA is silent on the requisite degree of certainty for establishing a "take."  675 F.Supp 2d at 562.  After reviewing the holdings of other courts construing the federal ESA and the history of the regulations adopted by the federal Fish and Wildlife Service, it held that "in an action brought under [§1538] of the ESA, a plaintiff must establish, by a preponderance of the evidence, that the challenged activity is reasonably certain to imminently harm, kill, or wound the listed species." *Id.* at 563.  The court left open the possibility that a lesser standard might apply if "harassment" were the basis of the alleged take.  *See id.* at 561 n.26, 563 n.29.  On the facts of the case before it, the court concluded that plaintiffs had met the potentially higher standard and that Beech Ridge Energy should have obtained an ITP.  Accordingly,  the  court  enjoined  the  company  from  building additional wind turbines and from operating those already under construction built unless the bats were in hibernation. *Id*. at 580-81.

### *Standard for showing that a project would "harass"*

With respect to the standard for demonstrating whether a project would "harass" an endangered species – a question left open in *Beech Ridge* – there are few cases that construe that term.  In *Babbitt v. Sweet Home Chapter,* 515 U.S. 687 (1995), the Supreme

Court suggested that the term "harass" encompasses deliberate actions aimed at the endangered species and would not include an indirect means of injuring wildlife such as habitat modification – which the Court held was covered by the term "harm." The Court stated, in relevant part:

> …if the statutory term "harm" encompasses such indirect means of killing and injuring wildlife as habitat modification, the other terms listed in [the definition of "take"] – "harass," "pursue," "hunt," "shoot," "wound," "kill," "trap," "capture," and "collect" – generally retain independent meanings. Most of those terms refer to deliberate actions more frequently than does "harm," … In addition, most of the other words in the definition describe either actions from which habitat modification does not usually result (*e.g.*, "pursue," "harass") or effects to which activities that modify habitat do not usually lead (*e.g.,* "trap," "collect")….

515 U.S. at 698 n. 11.

The lower court decisions that construe the term "harass" generally paraphrase the definition in the federal regulation. The Ninth Circuit has stated that a party attempting to prove a "take" in the form of harassment must demonstrate "by a preponderance of the evidence that the proposed construction would … more likely than not harass [the endangered species] by annoying it to such an extent as to disrupt its normal behavioral patterns." *See Defenders of Wildlife v. Bernal,* 204 F.3d 920, 925 (9th Cir. 1999).

In *Marbled Murrelet v. Pacific Lumber Co.*, 880 F.Supp.1343, 1367 (N.D. Cal. 1995), the federal district court granted injunctive relief in part because it found that a proposed timber harvest during the breeding season of an endangered species "creates the likelihood of injury [to the species] by annoying them to such an extent that it will significantly disrupt their normal behavior patterns." On appeal, the Ninth Circuit affirmed the grant of injunctive relief, but did not discuss the harassment standard or the sufficiency of the evidence under that standard, as it determined

that the timber harvest would "harm" the endangered species. *Marbled Murrelet v. Babbit*, 83 F.3d 1060, 1068 & n.5 (9th Cir. 1996), *cert. denied*, 519 U.S. 1108 (1997).

If, as suggested in the *Sweet Home Chapter* decision, the term "harass" refers only to deliberate efforts to affect wildlife and does not ordinarily include habitat modification, it may not apply to a wind turbine project. In any event, it appears from the extant case law that, to obtain relief on the basis that a project would "harass" an endangered species, a plaintiff would have to demonstrate, by a preponderance of the evidence, that it was "more likely than not" that the project would annoy the endangered species to such an extent as to disrupt normal behavior patterns.

## B.      The State ESA

Maryland has two virtually identical endangered species laws: the Endangered Species of Fish Conservation Act, Annotated Code of Maryland, Natural Resources Article ("NR"), §4-2A-01 *et seq.*; and the Nongame and Endangered Species Conservation Act, NR §10-2A-01 *et seq.* (collectively, the "State ESA"). These laws prohibit the "take" of any endangered species of fish or wildlife. NR §4-2A-05(c)(2); NR §10-2A-05(c)(2). The statutes also prohibit the "take" of any fish or wildlife deemed by DNR to be "in need of conservation," except as provided by rules or regulations adopted by DNR. NR §4-2A-03(c); NR §10-2A-03(c).

### *Definitions of key terms similar to federal law*

The definition of "take" is the same as the federal ESA definition. *See* NR §4-2A-01(h); NR §10-2A-01(h). DNR has adopted regulations to implement the State ESA. *See* COMAR 08.03.08. Those regulations contain definitions of the terms "harass," COMAR 08.03.08.01B(5), and "harm," COMAR 08.03.08.01B(6), that mirror the federal ESA regulations.[1]

---

[1] The adverb "actually" appears before the verbs in the federal regulation defining "harm." *See* 50 CFR §17.3. That word and references to habitat modification and degradation were removed from, but later reinstated in, the federal regulation when an attempt was made to rewrite it in 1981. *See* 46 Fed.Reg. 29490-94 (June 2, 1981); 46 Fed.Reg. 54748-01 (November 4, 1981). In our view, the absence of that adverb from the State definition of the term does not create a meaningful difference between the federal and State definitions.

No Maryland appellate court has construed the terms "take," "harm," or "harass" as they appear in the State ESA. However, these are the same key terms that appear in the federal ESA and the State ESA is designed specifically to coordinate with the federal ESA. *See* NR §4-2A-02; NR §10-2A-02(3). Thus, it seems likely that Maryland courts would apply the same standards applied under the federal law as outlined in the previous section of this letter.

### *Creation of lists of species*

The State ESA encompasses any species which is considered endangered or threatened under the federal ESA. NR §4-2A-01(d)(i); NR §10-2A-01(d)(i). In addition, the Secretary of Natural Resources is to develop and maintain lists of threatened and endangered species. NR §4-2A-04; NR §10-2A-04. Interested persons may petition the Director of the Wildlife and Heritage Service to add a species to the State list, or to remove one from it. COMAR 08.03.08.02.

### *Remedies*

A person who takes an endangered species protected by the State ESA is subject to a fine of not more than $1,000, imprisonment for not more than one year, or both. NR §4-2A-07; NR §10-2A-07. However, the State ESA does not authorize civil penalties or citizen suits. Nor is there a general provision for an incidental take permit.[2] An incidental take permit may be issued, but only for the endangered Puritan Tiger Beetle, NR §10-2A-05.1, or the endangered Delmarva Fox Squirrel, NR §10-2A-05.2.

## II

## State Agency Responsibilities

You asked about the responsibilities of various State agencies under the State ESA. The statute accords primary responsibility to DNR, but also requires other State agencies to take account of endangered species in certain contexts.

---

[2] As explained in the next section of this opinion, DNR may issue permits for certain other reasons.

*A.     DNR*

The statute requires DNR to perform certain functions and authorizes it to take other actions.  DNR is to conduct ongoing investigations of fish and nongame wildlife in order to develop conservation programs and regulations that limit the taking, possession, transportation, export, and sale of species deemed to be in need of conservation. NR §4-2A-03; NR §10-2A-03.  In addition to those species deemed "endangered" or "threatened" under the federal ESA, DNR is to determine whether any other species of fish, wildlife, or plant "normally occurring within the State is an endangered or threatened species" due to, among other reasons, the "threatened destruction, modification or curtailment of its habitat or range."  NR §4-2A-04(b); NR §10-2A-04(b).  The statute specifies procedures for adding or removing a species from the list of threatened or endangered species.  NR §4-2A-04(d), -05(a); NR §10-2A-04(d), -05(a).  DNR is to create programs for conservation of endangered or threatened fish, wildlife, and plants, including acquisition of land and aquatic habitat.  NR §4-2A-06(a); NR §10-2A-06(a).

The State ESA authorizes the Secretary of Natural Resources to issue permits for activities otherwise forbidden by the statute "for scientific purposes" or "to enhance the propagation or survival of the affected species."  NR §4-2A-05(f); NR §10-2A-05(f); *see also* COMAR 08.03.08.03.  The Secretary may also issue permits for aquaculture operations involving endangered species.  NR §4-2A-05(f).

DNR may enter into conservation agreements with political subdivisions, other states, federal agencies, and even individuals concerning conservation of threatened or endangered species.  NR §4-2A-06(b); NR §10-2A-06(b).

Finally, DNR's Natural Resources Police are authorized to make arrests, conduct searches, and seize evidence and contraband related to criminal violations of the State ESA.  NR §4-2A-07; NR §10-2A-07.  If any fish, wildlife, plants, or related items are seized as part of an investigation, DNR may oversee their safekeeping prior to any forfeiture of those items.  *Id*.

*B.     Other State Agencies*

The State ESA requires that all "State departments and agencies, in consultation with and with the assistance of [DNR],

shall utilize their authorities in furtherance of the [State ESA] … by taking any action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of the endangered species or threatened species or result in the destruction or modification of habitat of the species which is deemed by the Secretary to be critical." NR §4-2A-06(c); NR §10-2A-06(c).

This provision applies to all State agencies. It can come into play, for example, when the Maryland Department of the Environment ("MDE") issues permits in connection with its review of projects under the Nontidal Wetlands Protection Act, Annotated Code of Maryland, Environment Article ("EN"), §5-901 *et seq.* If a landowner proposes to carry out regulated activities within nontidal wetlands, the landowner must first apply for and obtain a permit from MDE. When reviewing applications, MDE determines, through consultation with DNR, whether the proposed project will have an adverse impact on a listed species or its habitat. If it will, MDE evaluates options for reconfiguring the project to avoid the impact, and if the impact is unavoidable, requires mitigation measures that ensure that the project will not "jeopardize the continued existence of" a listed species or "result in the destruction or modification of" the species' critical habitat. *See* NR §4-2A-06(c); NR §10-2A-06(c).

## C.    *Public Service Commission*

### *Responsibilities under State ESA*

You specifically asked about the responsibilities of the PSC with respect to endangered species. The State ESA itself does not assign any particular responsibility to the PSC that is distinct from other agencies. Like other agencies, the PSC is to consult with DNR as necessary to ensure that its actions do not jeopardize the existence of an endangered or threatened species or result in the destruction or modification of critical habitat. In addition, under a law that predates the State ESA – the Power Plant Siting Act of 1971 ("Siting Act")[3] – the PSC is obligated to consult with DNR concerning the environmental ramifications of certain matters before it. That consultation may include the impact of a proposal on endangered species. We describe that law in greater detail in the next section.

---

[3] Chapter 31, Laws of Maryland 1971. The current version of the Act is now codified in different sections in several articles of the Annotated Code.

*Responsibilities under Siting Act*

The Siting Act establishes a licensing process for certain new generation facilities that integrates a comprehensive evaluation of a proposed construction site and the impact of the project on the surrounding community and the State. *See generally* Annotated Code of Maryland, Public Utility Companies Article ("PUC"), §7-207 *et seq.*; NR §§3-304 and 3-306.[4] In particular, the PSC decides whether to issue a certificate of public convenience and necessity ("CPCN") authorizing construction of a new facility. This evaluation process may require the PSC to deny a particular application or, more frequently, impose limitations on the proposed construction due to findings and recommendations of other State agencies reviewing the proposal in concert with the PSC.

Under the Siting Act, the PSC is the principal licensing authority for new generation in Maryland, but is subject to a requirement to evaluate and balance a number of factors as part of the decision making process. PUC §7-207(e). Beyond this consideration of specified factors, the PSC is required to ensure that its approval of the project and any conditions imposed on the developer meet State and federal statutory and regulatory requirements as determined by MDE and, more importantly for this issue, by a determination by DNR that a particular site is suitable for the proposed construction. *See* PUC §7-208.

As a threshold issue, the Siting Act requires the Secretary of Natural Resources to make a preliminary determination that a proposed site is suitable for the proposed construction. NR §3-304. Among the reasons for determining a site, or a portion of a site, is unsuitable may be the presence of species protected under the State

---

[4] The Siting Act predates the deregulation of electric generation. The Act was written on the premise that only vertically integrated utilities under the supervision of the PSC would build new generation. As a consequence, utilities acquired power plant sites far in advance of needed construction. Accordingly, the language in the Siting Act refers to preliminary site evaluations and 10-year plans which no longer apply to the development of generation in Maryland. However, the fundamental requirements of the Siting Act are still observed, even though what are commonly thought of as public utilities no longer build new generation. In particular, the deregulation law requires that any "person" intending to construct a generating station obtain a CPCN. Chapters 3,4, Laws of Maryland 1999, *codified in relevant part in* PUC §7-207; *see also* COMAR 20.79.

ESA.  If, after evaluation of the environmental assessment done by the reviewing agencies, the Secretary finds that construction would result in unacceptable impacts, the Secretary may deem the site, or a portion thereof, unsuitable.  In that event, the PSC may not approve the construction unless and until the condition or conditions that support the Secretary's determination are removed or otherwise satisfactorily mitigated.  NR §3-304.  As a further limitation on the PSC's discretion, the Siting Act requires DNR and MDE to conduct studies of the effects of the proposed project on certain of the State's resources and forward those studies and recommendations to the PSC as part of the CPCN process.  NR §3-306.[5]

---

[5] For example, in a CPCN proceeding several years ago involving an application for a 40 megawatt wind facility in Garrett County, the Secretary of Natural Resources deemed a portion of a proposed site for an array of wind turbines "not suitable," in part because of the potential for construction to result in a "take" of protected species.  The Secretary deemed the remainder of the site suitable and recommended that the PSC grant the CPCN except to limit the project to suitable areas.  *See* Letter of Secretary C. Ronald Franks (November 2, 2005) & Initial Recommended Condition 16 filed as Docket Item 101.  In the Matter of the Application Of Synergics Wind Energy, LLC. for a Certificate of Public Convenience And Necessity to Construct a 40-MW Wind Power Facility in Garrett County, Maryland, PSC Case No. 9008 ("Case No. 9008").  The Secretary relied on an agency review of the proposed site that found a number of State-listed species, particularly in the mid-portion of the site.  *See* Case No. 9008, Docket Items, 52, 78, and 88.  In the CPCN proceeding, the PSC hearing examiner accepted the Secretary's recommendation and issued a proposed order that granted a CPCN for the suitable portions of the site, but prohibited construction in the unsuitable portion of the site.  *See* Case No. 9008, Docket Item 125 (October 31, 2006).

Subsequent legislation created an exception to the CPCN requirement for wind generation facilities of 70 megawatts or less.  Chapter 163, Laws of Maryland 2007, *now codified as* PUC §7-207.1.  That provision also establishes an abbreviated approval process for these facilities that does not include the same comprehensive environmental review provided by the CPCN process.  However, the PSC would still have to take the State ESA into account in implementing that provision.

## III

## Conclusion

In comparison to the federal ESA, the State ESA provides similar, although not identical, protections for State-listed threatened and endangered species.  Given that the State ESA was patterned after the federal statute, Maryland courts construing the State ESA are likely to apply the standards developed under the federal ESA. In *Beech Ridge,* the federal district court granted an injunction against a wind energy project in West Virginia after it was demonstrated that the project was "reasonably certain" imminently to harm, kill, or wound a listed endangered species and the developer of the project had not obtained a permit allowing the incidental taking of an endangered species.

The State ESA charges DNR with carrying out particular functions.  It also requires all State agencies, in consultation with DNR, to ensure that their actions do not jeopardize endangered or threatened species.  Finally, the PSC is to obtain the views of DNR as to the suitability of energy projects, including wind projects that satisfy certain criteria, when it decides whether to issue a CPCN for such a project.

                                    Douglas F. Gansler
                                    Attorney General

                                    Robert N. McDonald
                                    Chief Counsel
                                      Opinions and Advice

*Editor's Note:*

This opinion was originally issued in slightly different form as a letter of advice.